## CIRCUIT COURT OF FAIRFAX COUNTY

Seniors Coalition, Inc., et al.

v.

Seniors Foundation, Inc., et al.

June 10, 1996

Case No. (Chancery) 143649

BY JUDGE JANE MARUM ROUSH

This matter came on to be heard on May 23, 1996, on the Plaintiffs' Motion for a Preliminary Injunction. At the conclusion of the hearing, the Court took the motion under advisement. The Court has now had the opportunity fully to consider the pleadings, the briefs, the exhibits entered into evidence, the testimony of the witnesses, and the argument of counsel. For the reasons stated below, the Plaintiffs' Motion for a Preliminary Injunction is granted.

### Background

This case arises out of the aftermath of the decision of the Virginia Supreme Court in *Stewart v. Lady*, 251 Va. 106, 465 S.E.2d 782 (1996). Prior to the decision of the Supreme Court, two separate boards of directors had been vieing for control of The Seniors Coalition, Inc. (the "Coalition"), a Virginia non-stock, non-profit corporation that has no members.[1] The Supreme Court ruled that the lawful board of directors of the Coalition consists of Warren D. Stewart, James G. Carlen, and Kim R. Pearson. The Court ruled that Karl W. Lady, James G. Aldige, III, and George P. McDonnell, who theretofore had been acting as the directors, were not lawful directors of the Coalition. The Supreme Court remanded

---

[1] The Coalition's principal activity is lobbying the U.S. Congress on issues of concern to senior citizens. The Coalition styles itself as a politically conservative alternative to the American Association of Retired Persons.

the case to this Court for entry of "any injunctive relief which may be necessary to effectuate this declaration." On January 17, 1996, this Court ordered that Lady, Aldige, and McDonnell cooperate in the transition of the management of the Coalition to the lawful board of directors. They were specifically ordered to turn over all property or information that they had belonging to the Coalition "including, but not limited to, any records, electronic or otherwise, of members of the Seniors Coalition, or donors to the Seniors Coalition, including all copies of such records." Order dated January 17, 1996, in *Stewart et al. v. Lady et al.*, Chancery No. 135406.

This case was commenced on February 7, 1996, by plaintiffs, the Coalition, Stewart, and Carlen, against defendants, The Seniors Foundation, Inc. (the "Foundation"), Lady, Aldige, and McDonnell. The Motion for Judgment[2] alleges that the individual defendants, while acting as directors of the Coalition, created the Foundation in 1993 and elected themselves to the board of directors of the Foundation. The Foundation was qualified as a charitable foundation under § 501(c)(3) of the Internal Revenue Code. As a result, contributions to the Foundation are tax deductible as charitable contributions, unlike contributions to the Coalition, which is a § 501(c)(4) corporation. According to plaintiffs, the Foundation, although formed in 1993, was not activated by the individual defendants until 1994 when the litigation over the lawful board of the Coalition commenced.[3] The plaintiffs contend that, while awaiting the Supreme Court's ruling, the individual defendants diverted assets from the Coalition to the Foundation:

> The apparent purpose of these transfers was to place valuable assets and operations of the Coalition under the Control of the [individual] Defendants as Foundation directors and to impede the lawful Coalition directors from re-asserting effective control over the assets and direction of the Coalition if the Virginia Supreme Court declared them to be the lawful directors.

---

[2] This case was commenced on the law side of the Court and was transferred to the equity side of the Court by order entered March 22, 1996.

[3] In July, 1994, Stewart, Carlen, and Pearson filed suit seeking a determination that they were the lawful directors of the Coalition. Trial was held in October, 1994. This Court ruled against Stewart, Carlen, and Pearson and in favor of Lady, Aldige, and McDonnell on December 22, 1994. On March 5, 1995, Stewart and Carlen appealed this Court's decision to the Virginia Supreme Court. Oral argument was heard by that Court on November 3, 1995. The Virginia Supreme Court reversed the trial court and ruled in favor of Stewart, Carlen, and Pearson on January 12, 1996.

Motion for Judgment, ¶ 17.

Trial on the Motion for Judgment and the Coalition's counterclaim (alleging tortious interference in contractual and business relations and civil conspiracy) has been scheduled for September 24, 1996. The plaintiffs have moved for a preliminary injunction. The plaintiffs ask that, pending trial on the merits, the Court enjoin the defendants from (1) conducting any mailings to people who have donated or otherwise responded to mailings by the Coalition, (2) marketing, renting, exchanging, or selling any lists of people who have donated or otherwise responded to mailings by the Coalition, (3) transferring the Foundation's mailing list to any third party, and (4) continuing to use "trade dress" that is deceptively similar to that used by the Coalition.

The defendant Foundation opposes the requested injunctive relief.[4] The Coalition argues that all transactions between the Coalition and the Foundation made while Lady, Aldige, and McDonnell were the directors of both corporations (prior to the Supreme Court's January 12, 1996, ruling) were fair to the Coalition. According to the Foundation, "[d]uring the time that the [individual defendants] were responsible for the operations of both the Coalition and the Foundation, they were careful to conduct themselves professionally and to use their business judgment in the best interests of both corporations." Opposition of the Foundation to Plaintiffs' Motion for Temporary Injunction, at 3. Furthermore, the Coalition contends, the plaintiffs' "intentional misconduct and unclean hands" bar them from obtaining equitable relief, and "temporary injunction principles oppose granting an injunction."

### Findings of Fact and Conclusions of Law

When the Foundation was formed in 1993, there was no ongoing or threatened dispute about the authority of Lady, Aldige, and McDonnell to act as directors of the Coalition. It was only after that litigation was instituted, however, that the Foundation was activated. In December, 1994, after the trial in this Court but before Judge Brown issued his ruling, Lady, Aldige, and McDonnell met in their capacities as directors of the Foundation and discussed contingency plans in the event they were not successful

---

[4] The defendants Lady, Aldige, and McDonnell filed a written opposition to the requested injunction but did not appear separately, by counsel, at the hearing on May 23, 1996, on the preliminary injunction.

in the litigation. Plaintiff's Ex. # 7. They developed a "preliminary operational plan" that provided, in part:

> Due to pending litigation and an expected judgment with regards to the Seniors Coalition, Inc., a 501(c)(4) organization, there are two possible operational directions for the [Foundation]:
>
> (A) If the court determines that McDonnell, Aldige, and Lady are the rightful directors of the Seniors Coalition, then the Foundation will opt to operate hand in hand with the Coalition.
>
> (B) If the court determines that McDonnell, Aldige, and Lady are not, then the Foundation will continue to operate independently of the Coalition.

Plaintiff's Ex. # 7. The operational plan assumed — incorrectly, as it turned out — that Lady, Aldige, and McDonnell would lose at the trial court level. They decided to "activate the [F]oundation so that they can continue their work should the courts rule against them." *Id.* The plan noted that the Foundation would be activated even "should the court rule in their favor."

The operational plan was not implemented in 1994 because this Court ruled in favor of Lady, Aldige, and McDonnell. It was, however, apparently reactivated after Stewart and Carlen appealed this Court's decision to the Virginia Supreme Court in March, 1995. In the Summer and Fall of 1995, Lady, Aldige, and McDonnell discussed various plans to form a new corporation "with essentially the same players as the Seniors Coalition" in part because of "[c]oncern that we may lose the lawsuit to Pearson et al. currently on appeal to the Virginia Supreme Court." Plaintiff's Ex. # 8.

On November 3, 1995, oral argument was heard in the Virginia Supreme Court on the Stewart and Carlen's appeal of Judge Brown's order. Apparently concerned that this Court's decision might be reversed by the Supreme Court, Lady, Aldige, and McDonnell turned their attention to activating the Foundation as a successor to the Coalition.

In November and December, 1995, the Coalition and the Foundation sent out a joint mailing, soliciting contributions from the Coalition's most active donors, in which 90% of each donation would go to the Coalition and 10% would go to the Foundation (the "90/10 Mailings"). These mailings were sent in lieu of scheduled mailings by the Coalition only. The Foundation paid 10% of the cost of the mailings and, in return, received 10% of the contributions to the Coalition made in response to those mail-

ings. As a result, the Foundation developed a list of 175,000 donors drawn largely from the list of most active donors to the Coalition.

In January, 1996, a scheduled mailing by the Coalition was cancelled, and a mailing was sent only on behalf of the Foundation. The mailing resulted in approximately $200,000.00 in estimated net proceeds that went into the coffers of the Foundation instead of to the Coalition. Plaintiff's Ex. # 11.

Finally, on January 5, 1996, before the Supreme Court ruled that Stewart, Carlen, and Pearson were the lawful directors of the Coalition, Lady, Aldige, and McDonnell, acting as directors of the Coalition, transferred the Coalition's mailing list and all of its funds to a trustee who would approve requests for the use of the mailing list and funds in his sole discretion. Also transferred was $150,000.00 of Coalition funds to the Coalition's law firm to represent the trustee in expected litigation challenging the trust arrangement and $150,000.00 of Coalition funds directly to the Foundation as a grant. In late February, 1996, the trustee returned the mailing list to the Coalition. The Foundation returned the $150,000.00 grant to the Coalition. Defendant's Ex. ## 21, 22. The law firm's retainer was likewise returned to the Coalition.

Following the Supreme Court's ruling, the Foundation has continued to solicit funds from the Coalition's donors on the mailing list that the Foundation obtained from responses to the 90/10 Mailings. This has caused some confusion in the minds of Coalition donors, as the Foundation has used the same logo as the Coalition and the same "trade dress" as the Coalition. At the hearing on the preliminary injunction, Thair Phillips of the Coalition testified that both the number of contributions and the average size of a contribution to the Coalition have declined since the Foundation began its mailings.

The parties met in late January, 1996, in order to negotiate a global settlement of the disputes between the Coalition, the Foundation, and the competing boards of directors. A draft settlement agreement was executed and placed in escrow, along with other settlement documents. One of these documents included a letter signed by Jake Hansen, formerly connected with the coalition and well known on Capitol Hill, endorsing the new management of the Coalition. That letter was to be released from escrow only if the settlement were effectuated. Unfortunately, the settlement collapsed. Nevertheless, the Coalition apparently forged Jake Hansen's signature on the escrowed letter and published it in its newsletter sent to its contributors. Defendant's Ex. # 26, p. 6.

In January, 1996, Carlen and Stewart, who were never directors of the Foundation, sent letters on Foundation letterhead to Foundation vendors instructing them not to take any further action on behalf of the Foundation. Defendant's Ex. # 29.

The Foundation contends that the Coalition is being advised by Daniel C. Alexander, a convicted racketeer, in contravention of Virginia law that prevents certain felons from soliciting funds for charities. *See* Va. Code Ann. § 57-57. *See also* Defendant's Ex. # 32. The Foundation claims that any decline in the Coalition's fortunes since the Supreme Court ruling is based not on the Foundation's mailings to 200,000 of the Coalition's 3,100,000 donors but instead is a result of front-page articles in the *New York Times* and the *Los Angeles Times* about the return of control of the Coalition to convicted felons.

### Standards for Injunctive Relief

Pursuant to Virginia Code § 8.01-628, "[n]o temporary injunction shall be awarded unless the court shall be satisfied of the plaintiff's equity." The Virginia Supreme Court has not yet decided a case that delineates the standards to be applied in granting or denying a preliminary injunction. Case law from the Fourth Circuit, however, is well-settled in this area. *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353 (4th Cir. 1991), applied the following test to determine whether to grant a temporary injunction:

(1) The likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied;

(2) The likelihood of harm to the defendant if the requested relief is granted;

(3) The likelihood that plaintiff will succeed on the merits; and

(4) The public interest.

926 F.2d at 359. The Court in *Rum Creek* noted that the "irreparable harm to the plaintiff and the harm to the defendant are the two most important factors." *Id.*

> If, after balancing those two factors, the balance "tips decidedly" in favor of the plaintiff . . . a preliminary injunction will be granted if "the plaintiff has raised questions going to the merits so serious, substantial, difficult, or doubtful, so as to make them fair ground for litigation and thus for more deliberate investigation."

*Id. quoting Blackwelder Furniture Co. v. Seilig Mfg. Co.,* 550 F.2d 189, 195 (4th Cir. 1977). Of course, to the Fourth Circuit's list of factors must be added the plaintiff's lack of an adequate remedy at law, which is closely associated with irreparable harm. *Wright v. Curtis,* 232 Va. 218, 349 S.E.2d 125 (1986).

Having balanced the relative hardship to the Coalition if no injunction is issued against the hardship to the defendant Foundation if an injunction issues, the Court concludes that the balance "tips decidedly" in favor of the Coalition. The likelihood of irreparable harm to the Coalition if the temporary injunction does not issue is great. Testimony was adduced at the hearing that the Coalition has received 160 or more telephone calls from irate donors, complaining about the multiple and confusing mailings they are receiving from the Foundation and the Coalition. Both the response rate and the amount of the average contribution have declined since the Foundation started appealing for funds from the mailing list derived from the 90/10 Mailing to Coalition donors. The Foundation contends that it will be "out of business" if the injunction issues. Nevertheless, the Court concludes that the balance of hardship tips in favor of prohibiting the Foundation from continuing to mail to the Coalition's donors pending a full determination of the merits of this case. The Foundation remains free to rent or create a new mailing list for its activities, one that is free from the taint of possibly having been obtained in violation of its directors' fiduciary duties to the Coalition.

The Court cannot conclude that money damages will be adequate to make the Coalition whole. If, indeed, the multiple mailing from the Foundation to the Coalition's donors are confusing the donors, it will be nearly impossible for the plaintiffs to quantify the amount of donations not made to the Coalition by confused or irate donors.

Furthermore, the Coalition "has raised questions going to the merits so serious, substantial, difficult, or doubtful, so as to make them fair ground for litigation and thus for more deliberate investigation."

From the evidence adduced at the hearing on the preliminary injunction, it appears that Lady, Aldige, and McDonnell, however well-intentioned they may have been, used their dual positions as both directors of the Foundation and the Coalition to assure that the Foundation and they, along with it, would be able to "hit the ground running" in the event that they were displaced as the directors of the Coalition. The 90/10 Mailings appear to be thinly-veiled attempts to obtain for the Foundation the Coalition's most valuable asset, its mailing list, at a fraction of its value. The

Foundation-only mailing in January, 1996, appears to have had no benefit to the Coalition. Indeed, approximately $200,000.00 was raised for the Foundation that otherwise would have gone to the Coalition. Although the more blatant transfers of the mailing list and funds of the Coalition to third parties on the eve of the Virginia Supreme Court's decision have been unwound, the fact that such transfers were ever undertaken is telling as to the intentions of the directors at a time when they owed fiduciary duties to both the Coalition and the Foundation.

The Foundation argues that the "public interest" factor weighs in favor of the Foundation, that the public will be better served by having two voices for speaking up for the interests of senior citizens on Capitol Hill. The only evidence before the Court on this factor, however, is that a significant number of the recipients of the multiple mailings have been confused and irate enough about the duplicative requests for their dollars that they have called the Coalition to complain. Indeed, many of those who called asked to be removed from the Foundation's mailing list.

### "Unclean Hands" Defense

The Foundation argues that the plaintiffs are not entitled to injunctive relief because they have not come to this Court with clean hands. They point to Alexander's racketeering conviction, the Coalition's apparent forgery of Jake Hansen's signature to his escrowed letter endorsing the new management of the Coalition, and the letter Carlen and Stewart sent to Foundation vendors in which they wrongly claimed to be directors of the Foundation. Although it is true that one must come to equity with clean hands, the doctrine is not without limits. "Equity does not demand that its suitors shall have led blameless lives." *Bond v. Crawford*, 193 Va. 437 (1952). The doctrine of "clean hands" will not be applied where an inequitable result would result: "Its purpose is to secure justice and equity, not to aid one in acquiring property to which he has no right." *Harrell v. Allen*, 183 Va. 722 (1945). Although the Court does not condone the apparent misrepresentations of the Foundation, Stewart, and Carlen, they do not appear to be of sufficient magnitude to defeat the requested equitable relief. Furthermore, there was no evidence that the misrepresentations caused any damage to the Foundation. The Court did not hear evidence sufficient to permit it to make a determination if Alexander's continuing involvement with the Coalition violates Code § 57-57. That is an issue to be explored at trial.

### Conclusion

For the foregoing reasons, a preliminary injunction will issue, prohibiting the Foundation from (1) conducting any mailings to people who have donated or otherwise responded to mailings by the Coalition, (2) marketing, renting, exchanging, or selling any lists of people who have donated or otherwise responded to mailings by the Coalition, (3) transferring the Foundation's mailing list to any third party, and (4) continuing to use "trade dress" that is similar to that used by the Coalition.

For the injunction to issue, Plaintiffs will be required to post with the Clerk of the Court a bond in the amount of $1,000,000.00 pursuant to Code § 8.01-631.