Wings, L.L.C.

v.

Capitol Leather, L.L.C., et al.

March 6, 2014

Case No. CL-2014-9

BY JUDGE BRUCE D. WHITE

This matter came before the Court for an evidentiary hearing on February 19, 2013, on Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction. After carefully considering the pleadings and the evidence presented at the hearing and for the reasons stated below, Plaintiff's Motion is denied.

### Background

Wings, L.L.C. ("Wings") is a company headquartered in Gainesville, Virginia, that is in the business of providing commercial and residential vinyl, fabric, and leather repair services. John Kia is the sole owner of Wings and started the business in 1996. In the past year and a half, Wings has provided services in Northern Virginia, the District of Columbia, Southern Maryland, and West Virginia.

The vast majority of Wings' customers are auto dealerships and collision centers who hire Wings to repair car interiors. Typically, Wings provides their services for customers on site. More specifically, Wings employees ("technicians") go to, for example, a dealership or garage and walk the lot to see which cars might need repair work. The technician then speaks with the customer's manager who decides which cars the technician will repair. The technician then begins the assigned work. Technicians are assigned a territory and they typically go to businesses in their territory once or twice a week. Technicians are paid on commission, although the exact amount depends on several factors. Wings' customers have no contractual relationship with Wings; however, several of the customers are franchises who will refer Wings to other franchises in the same chain.

Over the years, Mr. Kia has developed different techniques that he believes makes Wings' technicians better than the competitors. Mr. Kia teaches these techniques to Wings' technicians and the training takes approximately eight weeks. Typically, the first two weeks of training are spent with Mr. Kia, and then the trainees are sent out with more experienced technicians for the next several weeks. Mr. Kia also teaches a two-day seminar (sponsored by a third party) for people interested in the business of auto interior repair. During the seminar, Mr. Kia teaches students the basics of the business. Students are able to watch Mr. Kia work as well as practice with different tools. Finally, Mr. Kia has taken in individual students who are interested in auto interior repair and has trained them for two month periods. These students come to Mr. Kia where they are trained and then they go work elsewhere. These students sign contracts that they will not compete with Mr. Kia in his territory.

On March 16, 2010, Wings engaged Defendant Jeffrey Manalansan as an independent contractor to provide services as a vinyl, velour, and leather repair technician. On June 7, 2011, Wings engaged Defendant Cameron Fridey as an independent contractor to provide the same services. In early 2013, Wings brought both Mr. Manalansan and Mr. Fridey on as full time employees. On January 30, 2013, Wings entered into identical written agreements with Mr. Manalansan and Mr. Fridey for their full-time employment as technicians (the "Agreements"). The Agreements contain, *inter alia*, the following restrictive covenants:

> Paragraph 4.5 *Non-Solicitation*. Employee agrees that Employee will not, during Employee's employment with Employer, and for a twenty-four (24) month period immediately following the termination of Employee's employment with Employer (for whatever reason), directly (a) solicit any Customer for the purpose of providing services the same as or substantially similar to services provided by Employer to any such Customer during the twelve (12) month period preceding Employee's termination date.

> Paragraph 4.6 *Non-Competition*. Employee agrees that, during Employee's employment with Employer and for a twenty-four (24) month period immediate following termination of Employee's employment with Employer (for whatever reason), Employee will not be directly employed in a position that is the same, or substantially the same, as an employment position held by Employee with Employer during the twelve (12) months preceding Employee's termination date, with a business engaged in providing material, labor, or services that compete (or, upon commercialization would compete)

with the material, labor, or services provided by Employer at the time of Employee's termination (the provision of such material, labor or services is hereinafter called a "Competing Business"). Employee further agrees that, during Employee's employment with Employer and for a twenty-four (24) month period immediate following termination of Employee's employment with Employer (for whatever reason), Employee will not maintain any controlling interest in a Competing Business. Notwithstanding anything herein to the contrary, this Section 4.4 [sic] is not intended to restrict Employee from performing work for a Competing Business in some role that does not actually compete with Employer's business. This restriction shall only apply within any state of the United States or country outside the United States in which, during the twelve (12) months preceding Employee's termination, Employer has conducted or conducts business.

When they were first hired as independent contractors Mr. Manalansan and Mr. Fridey received extensive training and learned confidential methods and techniques used by Wings. They also learned Wings' marketing and business development methods as well as its pricing and financial information. Finally, Mr. Manalansan and Mr. Fridey were given access to Wings' confidential customer lists and personally interacted with Wings' customers.

On November 14, 2013, Mr. Manalansan informed Mr. Kia that he was quitting, effective immediately. Shortly thereafter, Mr. Kia learned that Mr. Manalansan had gone to work as a technician for Defendant Capitol Leather, L.L.C. ("CL"). CL was founded by Mr. Kia's son, Defendant Jonathan Kia, and is a company that competes with Wings (Mr. Manalansan, Mr. Fridey, CL, and Jonathan Kia are hereinafter collectively referred to as "Defendants"). Since November 14, 2013, Mr. Kia and his other son, Benjamin Kia, have witnessed Mr. Manalansan working for CL at dealerships that are or were Wings' customers.

Mr. Kia immediately demanded that Mr. Manalansan and CL stop their competitive activities. In response, CL sent Mr. Kia a letter stating that Mr. Manalansan had been hired as a technician and that CL had no intention of firing him or otherwise prohibiting him from working. Legal counsel for Wings then sent CL and Mr. Manalansan a formal cease and desist letter.

On December 14, 2013, Mr. Fridey informed Kia that he was quitting, effective immediately. Mr. Fridey told Benjamin Kia that he was considering working for CL. Since December 14, 2013, Mr. Kia has witnessed Mr. Fridey working at dealerships that are or were Wings' customers. Wings has experienced a considerable drop in revenue as a result of Defendants' actions.

During oral argument, Wings moved the Court to (1) enjoin Mr. Manalansan and Mr. Fridey from working for CL as technicians, (2) enjoin Mr. Manalansan and Mr. Fridey from soliciting Wings' customers (within the meaning of the Agreement), and (3) enjoin CL from working for Wings' customers (within the meaning of the Agreement).

## Arguments

Each of the parties have addressed the four factors laid out by the Supreme Court of the United States in *Winter v. National Res. Def. Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008), and adopted by the United States Court of Appeals for the Fourth Circuit in *Real Truth About Obama, Inc. v. Federal Election Comm.*, 575 F.3d 342 (4th Cir. 2009), vacated on other grounds, 559 U.S. 1089, 130 S. Ct. 2371, 176 L. Ed. 2d 764 (2010).

## A. *Likelihood of Success on the Merits*

### 1. *Plaintiff's Argument*

Wings argues that the Agreements contain clear, narrowly tailored restrictive covenants which remain valid and enforceable and that Mr. Manalansan and Mr. Fridey violated the Agreements by working as technicians for a competing company as well as soliciting Wings' customers. As to the restrictive covenants in the Agreements, Wings argues that (1) the geographic restriction is reasonable since Washington, D.C., is arguably not included (as the language of the Agreements only refers to states within the United States), (2) the geographic restriction is tied to a legitimate business interest because Wings gets referrals to other dealerships and franchises in other parts of the states in which they provide services, and (3) the twenty-four month time restriction is reasonable based on Virginia case law.

As to proving that the Agreements were breached, Wings argues that there is no shortage of evidence that Mr. Manalansan and Mr. Fridey have breached the Agreements. First, CL has admitted that Mr. Manalansan works for them as a technician. Second, Wings' employees have seen both Mr. Manalansan and Mr. Fridey providing services as technicians for Wings' customers on behalf of CL.

Finally, Wings asserts that Jonathan Kia knew that all Wings employees were subject to confidentiality, non-compete, and non-solicitation restrictions. Nevertheless, Jonathan Kia, as the owner of CL, induced Mr. Manalansan and Mr. Fridey to breach the Agreements, after which the Defendants worked in concert to solicit and pirate as many of Wings' customers as possible for their mutual benefit.

## 2. Defendants' Argument

Defendants first argue that the restrictive covenants in the Agreements are overbroad in their geographic scope as they fail to designate any specific state or country in which Wings has done business. Therefore, the non-compete could apply around the world. Defendants argue that Wings presumably provides services in the D.C. metropolitan area, however, the Agreements are enforceable all over Virginia, including parts of which are hundreds of miles or more from where Wings has done business or has a business interest. In addition, if Wings made even one sale over the internet to California, the non-compete would arguably apply to the entire state. Thus, the provision is overbroad.

Finally, Defendants argue that the twenty-four month term is longer than necessary to protect the legitimate interests of Wings and that it is unduly harsh and oppressive. Wings can use existing employees or hire new employees to replace employees who leave. A twenty-four month restriction is overbroad under the circumstances.

## B. *Irreparable Harm*

### 1. *Plaintiff's Argument*

Wings argues that every day that passes is another day that (1) Defendants reap the financial benefits from their continued servicing of Wings' customers, (2) CL enjoys the training, expertise, and inside information of Mr. Manalansan and Mr. Fridey, and (3) CL gains more of Wings' market share. CL has already taken some of Wings' customers, and the longer Defendants are allowed to work for Wings' former customers, the harder it will be for Wings to get those customers back. Finally, Wings asserts that, if Defendants are allowed to continue on their present path, there may not be anything left of Wings by the time the parties reach a trial on the merits.

### 2. *Defendants' Argument*

Defendants deny that Mr. Manalansan and Mr. Fridey have solicited any customers from Wings as that is the sole responsibility of Jonathan Kia and CL has no restriction on their ability to obtain past, current or future customers from Wings. This is a blatant attempt by Wings to stop its competitors from gaining a market share by falsely claiming that their success is due to the efforts of Mr. Manalansan and Mr. Fridey. In addition, Defendants argue that, even if Wings were to prove that CL wrongfully stole customers, damages can be calculated based on the financial loss they purportedly suffered, and, thus, injunctive relief is improper.

## C. *Balance of the Equities*

### 1. *Plaintiff's Argument*

Wings argues that it has suffered and continues to suffer financial harm as a result of Defendants' actions. On the other hand, Mr. Manalansan and Mr. Fridey can continue to work for CL in the District of Columbia or not as technicians. It would be inequitable to allow Defendants to continue in their competing activities when it is clear that (1) CL was aware of the Agreements and (2) Mr. Manalansan and Mr. Fridey have breached the Agreements. Finally, Wings argues that CL knew that luring Mr. Manalansan and Mr. Fridey, who had longstanding relationships with Wings' customers, would make it easier to steal those customers from Wings, since customers are more often loyal to the person with whom they deal, not the company who the person works for, which is why companies like Wings restricts their employee's ability to work for competitors.

### 2. *Defendants' Argument*

Defendants argue that Mr. Manalansan and Mr. Fridey do not have the means to go without employment and, if the preliminary injunction is granted, they will be left with no alternative employment opportunities within a commutable distance and they will be devastated financially. In addition, the facts of this case do not warrant such an extraordinary remedy.

## D. *Public Interest*

### 1. *Plaintiff's Argument*

Wings argues that a temporary injunction would rightfully confirm that individuals and competing companies who attempt to unjustly enrich themselves through unlawful actions will not be allowed to continue to do so during pending litigation. In addition, a temporary injunction will help Wings salvage its business. Wings could possibly fold as a result of Defendants' malfeasance, which would result in the loss of jobs for Virginia citizens and lower tax revenues paid to the Commonwealth.

### 2. *Defendants' Argument*

Defendants argue that restraints of trade are disfavored in the law. In the case at bar, the restrictive covenants are not narrowly tailored and they are overbroad and violate public policy. The law encourages free market in labor, especially in services, as well as competition among businesses. Since the non-compete agreement is unenforceable and should be invalidated, an injunction based on the Agreements is not in the public's interest.

*Analysis*

> Every circuit court shall have jurisdiction to award injunctions ... whether the judgment or proceeding enjoined be in or out of the circuit, or the party against whose proceedings the injunction be asked resides in or out of the circuit.

Va. Code Ann. § 8.01-620 (2014).

The Supreme Court of Virginia has not yet decided a case which lays out the standard for analyzing whether or not to grant a preliminary injunction; however, several circuit courts of this Commonwealth have adopted the standard set by the Fourth Circuit. See e.g., *Villalobos v. City of Norfolk*, 62 Va. Cir. 158 (City of Norfolk 2003); *Am-Cor.com, Inc. v. Stevens*, 56 Va. Cir. 245, 248 (Warren County 2001); *Hotjobs.com, Ltd. v. Digital City, Inc.*, 53 Va. Cir. 36, 39 (Fairfax County 2000); *Danville Historic Neighborhood Ass'n v. City of Danville*, 64 Va. Cir. 83 (City of Danville 2004); *Wilson v. Henry County Zoning Appeals Bd.*, 68 Va. Cir. 317 (Henry County 2005); *SmartMail Servs. v. Ellis*, 66 Va. Cir. 507, 509 (Chesterfield County 2003).

The Fourth Circuit has articulated the test for granting a preliminary injunction as follows:

> In its recent opinion in *Winter*, the Supreme Court articulated clearly what must be shown to obtain a preliminary injunction, stating that the plaintiff must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 374, 172 L. Ed. 2d 249. And all four requirements must be satisfied. *Id.* Indeed, the Court in *Winter* rejected a standard that allowed the plaintiff to demonstrate only a "possibility" of irreparable harm because that standard was "inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."

*Id.* at 375-76. *Real Truth About Obama, Inc. v. Federal Election Comm.*, 575 F.3d 342, 345 (4th Cir. 2009), vacated on other grounds, 559 U.S. 1089, 130 S. Ct. 2371, 176 L. Ed. 2d 764 (2010). Utilizing the four factor test set out in *Real Truth About Obama*, this Court finds that Plaintiff's request for a preliminary injunction should be denied.

A. *Likelihood of Success on the Merits*

During evidentiary hearing, Wings almost exclusively provided evidence on the factual question of whether or not Mr. Manalansan and Mr. Fridey were soliciting and/or working for Wings' customers in violation of the Agreements. Defendants did not rebut this evidence with any evidence of their own, save for Jonathan Kia's affidavit which states that Mr. Manalansan and Mr. Fridey have not solicited customers. The Court finds, that Mr. Manalansan and Mr. Fridey have performed services on behalf of CL for Wings' customers within the definition of the Agreements. The Court also finds that this was done less than twenty-four months from the date Mr. Manalansan and Mr. Fridey stopped working for Wings. Therefore, the Court finds that, for the purpose of this motion, Mr. Manalansan and Mr. Fridey breached the Agreements.

Based on this finding, the analysis as to the likelihood of Wings' success on the merits becomes a question of law, namely, whether the Agreements' restrictive covenants are reasonable as a matter of law and, thus, enforceable.

> The enforceability of a provision that restricts competition is a question of law that we review *de novo*. It is enforceable if it is narrowly drawn to protect the employer's legitimate business interest, is not unduly burdensome on the employee's ability to earn a living, and is not against public policy. The employer bears the burden of proving each of these factors. When evaluating whether the employer has met that burden, we consider the function, geographic scope, and duration elements of the restriction. These elements are considered together rather than as three separate and distinct issues.

*Home Paramount Pest Control Cos. v. Shaffer*, 282 Va. 412, 415-16, 718 S.E.2d 762 (2011) (internal quotations and citations omitted). In this case, the Court is particularly concerned with the geographic and time elements of the Agreements' restrictions. First, the geographic restriction is overly broad and not narrowly drawn to protect the employer's legitimate business interest. Wings did present evidence that they sometimes expand their business to different parts of Virginia and Maryland through referrals from customers; however, the Agreements' geographic limitation would prevent Mr. Manalansan and Mr. Fridey from being technicians in, for example, Abingdon, Virginia, which is approximately 300 miles away from where Wings conducts business. Wings did not present any evidence that they had a legitimate business interest in restricting competition in all parts of the Commonwealth. This overly broad geographic restriction is also unduly burdensome on Mr. Manalansan's and Mr. Fridey's ability to earn a living. They are technicians trained in leather repair and they live in the

greater Washington, D.C., area. Requiring them to locate work that is not in Virginia, Maryland, or West Virginia certainly puts a significant burden on them in their efforts to earn a living. Curiously, during oral argument, counsel for Wings seemed to concede that the Agreements could not be read to limit Mr. Manalansan and Mr. Fridey from providing their services in Washington, D.C., however, even if this would not be a violation of the Agreements, the geographic restriction still presents an unreasonable burden on the employees. Finally, public policy does not support upholding such an overly broad geographic limitation that would unreasonably burden the employees' ability to earn a living.

Second, the duration of the restrictions is unreasonable in light of the geographic restriction. Wings argues that the twenty-four month time period is reasonable *per se* based on Virginia case law. Wings is correct that covenants not to compete that last for two years (or more) have been held to be enforceable under Virginia law. See, e.g., *Worrie v. Boze*, 191 Va. 916, 929, 62 S.E.2d 876 (1951) (enforcing a two year restriction); *Blue Ridge Anesthesia & Critical Care, Inc. v. Gidick*, 239 Va. 369, 374, 389 S.E.2d 467 (1990) (enforcing a three year restriction). However, the duration restriction must be viewed in the context of the other restrictions. In this case, Mr. Manalansan and Mr. Fridey would be prohibited from working as technicians for two years throughout the entire states of Virginia, Maryland, and West Virginia, and possibly in Washington, D.C. As with the geographic restriction, Plaintiff put forward no evidence as to why a restriction that lasts for two years was narrowly tailored to meet a legitimate business interest. In addition, a two year restriction on working as a technician over such a broad geographic area puts a significant burden on Mr. Manalansan's and Mr. Fridey's ability to earn a living. Finally, as with the geographic restriction, it would be against public policy to uphold the two year restrictions set out in the Agreements.

Although a finding that Wings is unlikely to succeed on the merits is sufficient to deny this motion, the Court will also address the irreparable harm and public interest prongs of the *Real Truth About Obama* test.

## B. *Irreparable Harm*

Although Wings will likely continue to lose customers and business if the preliminary injunction is not entered, the Court does not agree that Wings will be irreparably harmed. This is, in large part, because Wings has not put forth a legitimate argument as to why it does not have an adequate remedy at law in this case. For example, when asked by the Court at oral argument why money damages would not be sufficient, counsel for Wings only replied that there was no baseline upon which to calculate damages. The Court questions this assertion. It does not seem reasonable that Wings would not be able to determine how much income they received from certain customers both prior to and after the breach of the Agreements, the

difference presumably being the income lost due to the breaches. Perhaps Wings would face problems proving causation or asserting damages that are speculative, such as lost income due to referrals; however, Wings has not met its burden of showing that it will suffer irreparable harm in the absence of the preliminary injunction.

## C. *Public Interest*

As this Court believes that the restrictive covenants in the Agreements are unenforceable and that Wings is unlikely to succeed on the merits, it would be against public policy to enter the preliminary injunction.

### *Conclusion*

Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction is denied.